# EXHIBIT D

**FILED**
**9/27/2022 11:13 PM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

**IN THE CIRCUIT COURT OF THE 19TH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | |
|---|---|
| AMELIA TENORIO, individually and as parent and next-friend of C.M., and ANTONIO MELGAR, individually and as parent and next friend of C.M., | |
| | 22LA00000493 |
| Plaintiffs, | No.: |
| | **DEMAND FOR JURY TRIAL** |
| v. | |
| SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., BUDSGUNSHOP.COM, LLC, RED DOT ARMS, INC., ROBERT CRIMO, JR. and ROBERT CRIMO, III, | NOTICE |
| | PURSUANT TO LCR - 2-2.14 |
| | THIS CASE IS HEREBY SET FOR AN INITIAL CASE MANAGEMENT CONFERENCE IN COURTROOM _____ ON |
| | AT _____ A.M./P.M. |
| Defendants. | FAILURE TO APPEAR MAY RESULT IN THE CASE BEING DISMISSED OR AN ORDER OF DEFAULT BEING ENTERED. |

## COMPLAINT AT LAW

Amelia Tenorio, Antonio Melgar, and minor C.M. (jointly, the "Tenorio-Melgar Family"), by and through their attorneys, state as follows for their complaint at law against defendants, Smith & Wesson Brands, Inc., Smith & Wesson Sales Company, Smith & Wesson, Inc. (collectively, "Smith & Wesson"); Budsgunshop.com, LLC ("Bud's Gun Shop"); Red Dot Arms, Inc. ("Red Dot Arms"); Robert Crimo, Jr. (the "Shooter's Father"); and Robert Crimo, III (the "Shooter"):

## INTRODUCTION

1.      The parade started out like any other—a familiar scene across America on the Fourth of July—with floats, marching bands, and fanfare. This was the first Fourth of July parade in the City of Highland Park after two years of cancellations due to COVID-19. Hundreds of families woke up early to find the best seats along the parade route, hoping to enjoy an American tradition. But when shots rang out at 10:14 a.m., Highland Park's Fourth of July Parade became another example of something all too uniquely American: the site of a mass shooting.

2.     At first, Amelia Tenorio thought they were fireworks. But then, she heard whizzing sounds, before seeing the projectiles land all around her and her family. She quickly realized she and her family were being shot at. Amelia and Antonio moved quickly to protect C.M., trying to rush him into nearby Gearheads. Despite their quick efforts, Mirna was grazed by a bullet and C.M. was shot.

3.     The bullets were coming from a nearby rooftop, where a 21-year-old obsessed with violence and armed with a Smith & Wesson Military and Police ("M&P") assault rifle was indiscriminately targeting and killing people along the parade route. The Shooter exchanged one empty magazine for another at least three different times. He fired 83 rounds in seconds. Seven people were killed, dozens were injured, and countless others will be traumatized forever.

4.     The mass shooting at Highland Park's Fourth of July Parade was the foreseeable and entirely preventable result of a chain of events initiated by Smith & Wesson. For years, the manufacturer has deceptively and unfairly marketed its assault rifles in a way designed to appeal to the impulsive, risk-taking tendencies of civilian adolescent and post-adolescent males—the same category of consumers whom Smith & Wesson has watched, time after time, commit the type of mass shooting that unfolded again on the Fourth of July in Highland Park. Smith & Wesson's M&P rifles have been repeatedly used in such mass shootings, including those in Aurora, Colorado; San Bernardino, California; and Parkland, Florida.

5.     Instead of taking steps to stop or reduce the risk of this senseless slaughter, Smith & Wesson facilitates violence for profit. It employs sales and marketing practices that create and feed a consumer base of young, civilian men who keep the money rolling in by purchasing not only the rifles, but all the deadly accessories that go with them—optics, high-capacity magazines, silencers, and laser-aiming devices, among others. When these consumers foreseeably use Smith

& Wesson assault rifles in mass shootings, the families and communities affected suffer while Smith & Wesson celebrates a boost to its bottom line. Smith & Wesson knows that demand for its weapons increases in the aftermath of mass shootings. Rather than behave responsibly, Smith & Wesson stokes fear of gun regulations after each shooting to increase that demand.

6.      Smith & Wesson's marketing and promotion attracts young men looking for military-style rifles to act out a perverse combat fantasy of killing as many people as possible. And Smith & Wesson knows it. It promises that its assault rifles will provide "More Adrenaline," encourages consumers to "Kick Brass," and models advertisements after first-person shooter video games. It utilizes social media influencers who try to pump up civilian purchases by showing followers how to use M&P assault rifles in combat-like situations, including teaching how "to get accurate hits on target" while avoiding bullets by moving from "cover to cover.[1] And it showcases the combat-like use of its branded assault rifle in its own advertisements.[2]

7.      Smith & Wesson also misleadingly implies that its rifles are used or endorsed by the U.S. military, a strategy referred to as the "halo" effect by its former CEO.[3] The reality, however, is that none of its assault rifles are sold to the U.S. military. Smith & Wesson uses this deceptive marketing despite knowing that a subset of the consumers attracted by the appeal of militaristic combat missions are impulsive young men prone to violence, like the Shooter here.

8.      The Shooter fits the demographic of customers that Smith & Wesson targeted with its negligent and unlawful marketing. An avid user of the social media platforms used by Smith

---

[1]      Provectus Group (@provestusgroup), INSTAGRAM (July 30, 2020), *available at* https://perma.cc/DR43-NL8V.

[2]      Smith & Wesson, Inc, *"The NEW Smith & Wesson Volunteer Rifle Series,"* YOUTUBE (Jan. 18, 2022), *available at* https://perma.cc/Y29Q-H5JP.

[3]      Smith & Wesson Holdings Corp., Current Report (Form 8-K), Exhibit 99.1 at 11 (Tr. of Conference Call and Webcast Conducted on Sept. 1, 2016) (Sept. 2, 2016).

& Wesson to promote its assault rifles, the Shooter displayed his hardcore violent fantasies online, styling himself on one platform as a "Master Gunnery Sergeant," and on others as a video game assassin. He spewed hatred online and often posted videos of himself playing first-person-shooter games. In one animated video, he drew a young man in tactical gear, holding an assault rifle and shooting people before police appear and kill the shooter. In another, he appears in a classroom in a helmet and tactical vest.

9.      At the age of 18, in 2019, the Shooter attempted suicide. The following year, in 2020, shortly after creating his "Master Gunnery Sergeant" profile, he went online to buy a Smith & Wesson assault rifle. On July 4, 2022, armed with his Smith & Wesson rifle, he was able to act out his violent fantasy—like so many disturbed and hate-filled young men before him. The shooting played out in an entirely foreseeable way—with extreme and limitless power—just as Smith & Wesson advertised it would.

10.     Far from accepting any responsibility, after the Highland Park shooting, Smith & Wesson has painted *itself* as the victim, recently tweeting about "an unprecedented and unjustified attack on the firearm industry."[4] The company's strident refusal to acknowledge its role in tragedies like Highland Park and its continued use of negligent and unlawful marketing and sales practices poses a clear and unacceptable risk to public safety.

11.     The marketing and sales practices of Smith & Wesson and other entities within the gun industry are the beginning and pivotal links in a foreseeable and predictable chain of events resulting in numerous mass shootings in America each year. With full knowledge and appreciation of its role in facilitating these mass shootings, Smith & Wesson continues to intentionally and

---

[4]     Smith & Wesson, Inc (@smithandwessoninc), TWITTER (Aug. 15, 2022), *available at* https://perma.cc/A3XS-MYTW.

recklessly advertise, market, promote and sell a warrior mentality that a certain subset of youths and young men fantasize will propel them into infamy. It has not taken even the simplest steps to prevent or discourage young, impulsive would-be mass shooters from acquiring its weapons, such as implementing age gates on its social media, warning consumers about the dangers of assault rifles, or making it harder for individuals like the Shooter to acquire their products. Smith & Wesson's practices are negligent and unlawful under the Illinois Uniform Deceptive Trade Practices Act and the Illinois Consumer Fraud and Deceptive Business Practices Act.

12.     After years of conditioning by perverse and pervasive marketing by Smith & Wesson and the gun industry, would-be mass murders—like the Shooter—naturally look to obtain the products associated with the idolized warrior mentality featured by these promotions.

13.     At the age of 19, the Shooter was able to purchase the M&P assault rifle he used to terrorize Highland Park. The Shooter's father sponsored his son's Firearm Owners Identification (FOID) card application, despite knowing that his son was a clear and present danger, and had only months before threatened suicide with a machete and threatened to kill everyone in his house. To sponsor the FOID application, the Shooter's Father signed an affidavit acknowledging that his sponsorship of the Shooter's FOID card carries with it "liab[ility]for any damages resulting from the minor applicant's use of firearm or firearm ammunition." He too is liable for the havoc and death caused by his son.

14.     Armed with a disturbing thirst for violence stoked by Smith & Wesson's marketing and a FOID card sponsored by his reckless father, the Shooter next needed to obtain a weapon of war to carry out his "mission." In or around June or July 2020, the Shooter went onto the website for Bud's Gun Shop, where he selected Smith & Wesson's M&P rifle for purchase. Bud's Gun

Shop sold the M&P assault rifle to the Shooter despite the fact that it is illegal for residents of Highwood, Illinois and Highland Park, Illinois to acquire and possess assault weapons.

15.     Bud's Gun Shop then shipped the gun to Red Dot Arms, a gun dealer located in Illinois, which transferred the assault rifle to the Shooter. Both companies (together, the "Gun Store Defendants") knew the Shooter's address, and thus knew that they were selling an assault rifle to a resident of a municipality that prohibited the possession of such weapons. Nevertheless, they proceeded with the sale and transfer, enabling the Shooter to carry out his deadly mission.

16.     For years, Smith & Wesson, Bud's Gun Shop, Red Dot Arms, and other entities in the gun industry have, through their misconduct and illegal practices, been able to profit off the actions of disturbed and hate-filled young men like the Shooter. They, like the Shooter's Father, willfully ignored the public's right to be safe from violence by placing a weapon of war into the Shooter's hands. All of these actors must be held accountable for the massacre at Highland Park's Fourth of July Parade.

## PARTIES

17.     Plaintiff Amelia Tenorio is a resident of Highland Park, Illinois. She was present at the Fourth of July Parade in Highland Park, along with members of her immediate family. Amelia was grazed by a bullet in the backside by the Shooter and treated at Highland Park Hospital. In addition to the physical pain that Amelia continues to endure, she suffered, and continues to suffer, severe emotional distress, stemming from the attack on her and her family.

18.     Plaintiff Antonio Melgar is a resident of Highland Park, Illinois, and is the husband of Amelia Tenorio. He was present at the Fourth of July Parade in Highland Park, along with members of his immediate family. Antonio perceived the shooting as it was happening and grabbed

C.M., his child, to protect him from harm in the immediate aftermath of the shooting. He suffered, and continues to suffer, severe emotional distress stemming from the attack on him and his family.

19.     Plaintiffs C.M. is the minor child of Amelia Tenorio and Antonio Melgar. He is a resident of Highland Park, Illinois, and was present at the Fourth of July Parade in Highland Park. C.M. was shot by a bullet in the leg by the Shooter and treated at Highland Park Hospital. In addition to the physical pain that C.M. continues to endure, he suffered, and continues to suffer, severe emotional distress, stemming from the attack.

20.     Defendant Smith & Wesson Brands, Inc. (f/k/a American Outdoor Brands Corporation) is a for-profit Nevada corporation, with its principal place of business in 2100 Roosevelt Ave. in Springfield, Massachusetts 01104.

21.     Defendant Smith & Wesson Sales Company (f/k/a American Outdoor Brands Sales Company; f/k/a Smith & Wesson Corp.) is a for-profit Delaware corporation and a wholly owned subsidiary of Smith & Wesson Brands, Inc. Smith & Wesson Sales Company is a federally licensed firearms manufacturer and importer that operates at 1800 North Route Z in Columbia, Missouri 65202 and has its principal office at 2100 Roosevelt Ave. in Springfield, Massachusetts 01104.

22.     Defendant Smith & Wesson, Inc. (f/k/a Smith & Wesson Firearms, Inc.) is a for-profit Delaware corporation and a wholly owned subsidiary of Smith & Wesson Sales Company, which is itself a wholly owned subsidiary of Smith & Wesson Brands, Inc. Smith & Wesson, Inc. is a federally licensed firearms manufacturer and importer that operates at 2100 Roosevelt Ave. in Springfield, Massachusetts 01104 where it also has its principal office.

23.     Collectively, the Smith & Wesson defendants manufacture, design, market, and sell the M&P line of assault rifles under the Smith & Wesson and M&P brand names.

24.     One or more of the Smith & Wesson defendants manufactured, designed, marketed and sold the Smith & Wesson M&P15 semiautomatic rifle that was used in the shooting in Highland Park, Illinois on July 4, 2022.

25.     Defendant Bud's Gun Shop is and at all relevant times has been a distributor of firearms and is federally licensed to deal in firearms. Bud's Gun Shop is headquartered in Lexington, Kentucky. It has multiple physical locations in Kentucky and Tennessee, as well as a large online retail presence. Bud's Gun Shop advertises itself as "America's # 1 Online Retailer of Firearms, Ammunition and Accessories."

26.     In or around June or July of 2020, Bud's Gun Shop sold the Shooter the Smith & Wesson M&P15 semiautomatic rifle that he used in the shooting in Highland Park, Illinois on July 4, 2022.

27.     Defendant Red Dot Arms is a retail gun store located in Lake County, Illinois. In or around June or July of 2020, it transferred to the Shooter the Smith & Wesson M&P15 semiautomatic rifle he used in Highland Park, Illinois on July 4, 2022.

28.     Defendant Robert Crimo, III, the Shooter, lived in and, upon information and belief, was a resident of Highwood, Lake County, Illinois at the time of the shooting.[5] He has been charged with 21 counts of first-degree murder, 48 counts of attempted murder, and 48 counts of aggravated battery and, upon information and belief, he is now in custody in the Lake County Jail.

29.     The Shooter purchased the Smith & Wesson M&P15 assault weapon online from Budsgunshop.com in June or July of 2020, when he was 19 years old. He subsequently picked it

---

[5]     Based upon publicly-available information, the Shooter was associated with two addresses: one in Highwood and one in Highland Park, both in Lake County, Illinois. However, it appears that his last official place of residence was in Highwood.

up from Red Dot Arms and later used it to open fire on hundreds of innocent people attending the Fourth of July parade in Highland Park, Illinois.

30.     Defendant, Robert Crimo, Jr., the Shooter's Father, has at all relevant times lived in Highland Park, Lake County, Illinois.  The Shooter's Father and his son are jointly referred to herein as the "Crimo Defendants."

31.     The Shooter's Father sponsored his then-minor son's application for a FOID Card, which required him to attest under oath that he "understand[s] [he] shall be liable for any damages resulting from the minor applicant's use of firearm or firearm ammunition."

## JURISDICTION AND VENUE

32.     This is an Illinois action directly affecting residents of Lake County, Illinois. It is brought on behalf of Lake County residents for losses and harms that occurred in Lake County, as a result of Defendants' utter indifference, recklessness, willful, and wanton conduct.

33.     This Court has jurisdiction over Smith & Wesson and Bud's Gun Shop pursuant to 735 ILCS 5/2-209 because they conduct business transactions in Illinois, have committed tortious acts in Illinois, and have transacted substantial business in Illinois that caused harm in Illinois, including business that is the subject matter of this complaint.

34.     This Court has jurisdiction over the Crimo Defendants and Red Dot Arms because they are residents of Illinois.

35.     Venue is proper in this Court under 735 ILCS 5/2-101 and 5/2-102, as the transactions and occurrences that form the basis for this complaint occurred, in part, in Lake County, and Red Dot Arms as well as the Crimo Defendants reside in Lake County.

## GENERAL ALLEGATIONS

36.     Each Defendant enabled the Shooter to carry out a massacre on July 4, 2022.

37.     *First*, Smith & Wesson knowingly sought to place its weapons in the hands of disturbed young men by targeting and exploiting the risk-seeking—and often troubling—desires of these consumers.  The Shooter and other would-be mass shooters are highly susceptible to the disturbing promotional messages from Smith & Wesson, which foreseeably feed the desires of these young men to act out their militaristic fantasies on a civilian population.

38.     *Second*, the Shooter's Father enabled the Shooter's thirst for violence by sponsoring his FOID application, despite his knowledge that the Shooter was disturbed and had threatened violence, thus allowing the Shooter to legally obtain the very weapon of war that Smith & Wesson had been promoting to consumers like the Shooter for years.

39.     *Third*, Bud's Gun Shop and Red Dot Arms enabled the Shooter to obtain the Smith & Wesson M&P assault rifle despite the fact that it was illegal for him to possess this weapon.

**I.      <u>Smith & Wesson Designs and Markets Weapons of War to Civilians.</u>**

     *a.   <u>The Evolution of the Assault Weapon</u>*

40.     The assault rifles manufactured and promoted by Smith & Wesson to individuals like the Shooter have military origins.  They were originally designed to kill as many people as possible as quickly as possible.  Even today, Smith & Wesson promotes these rifles to consumers who fantasize about military-style combat.

41.     During World War I, infantry soldiers were generally equipped with long-range battle rifles, which did not meet the needs of the trench warfare that characterized the war.  As a result, countries began developing more compact, fast-firing weapons, such as the submachine gun.  By World War II, the German military had developed the StG 44, also known as the "storm gun," and the "father of all assault rifles," because "[a]fter the war it was examined and dissected

by almost every major gunmaking nation and led, in one way and another, to the present-day 5.56mm assault rifles."[6]

42.     The first AR-15 rifles were designed in 1957 by Armalite, a small arms engineering company, for the U.S. military.[7]  Armalite's goal was to create a lightweight portable select-fire rifle that would allow soldiers to quickly put many rounds on target from distances of a quarter mile or more.[8]  Thus, the AR-15 was designed to be effective in combat and to kill or disable as many enemy soldiers as possible as quickly as possible, even from far away.  Although Armalite developed the first AR-15, today the term "AR-15" designates the type of the firearm, rather than the brand.

43.     Armalite's design performed so well that the U.S. military concluded that a five- or seven-man squad armed with AR-15s (known within the military as M16 rifles) had as good or better "hit-and-kill potential" in combat-style tests than an 11-man squad armed with older, select-fire M14 rifles.  In fact, the U.S. Army directs that semiautomatic mode, rather than automatic fire, be used for virtually all purposes, because it is more effective and lethal.  The Army has concluded that "[a]t ranges beyond 25 meters, rapid semiautomatic fire is superior to automatic fire in all measures: shots per target, trigger pulls per hit, and even time to hit."[9]

44.     The distinctive appearance of assault weapons is the result of the gun's functional design.  Assault weapons "have incorporated into their design *specific* features that enable shooters

---

[6]     Violence Policy Center, *Understanding the Smith & Wesson M&P15 Semiautomatic Assault Rifle Used in the LAX Shooting* at 10 (Nov. 2013) (citation omitted).

[7]     "AR" stands for "Armalite Rifle."

[8]     A fully automatic rifle fires continuously as long as the trigger is held down.  A semiautomatic rifle fires one round for each trigger pull, and then automatically reloads the chamber with the next round.  A select-fire rifle can fire in either fully automatic or semiautomatic mode.

[9]     U.S. Dep't of Defense, *Operate Your Rifle Like a Pro: U.S. Army Official Manual,* at Chapter 7, Section II, 7-8 (2017).

11

to spray ('hose down') a large number of bullets over a broad killing zone, without having to aim at each individual target. These features not only give assault weapons a distinctive appearance, they make it easy to simply point the gun while rapidly pulling the trigger."[10] These design features make assault weapons particularly lethal.

45.     In 1968, Congress amended the National Firearms Act of 1934 ("NFA") and expanded the definition of machinegun to include "any weapon which shoots, is *designed to shoot,* or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b) (emphasis added). The definition includes "the frame or receiver of any such weapon," as well as "any part" or "combination of parts designed and intended, for use in converting a weapon into a machinegun," and "any combination off parts from which a machinegun can be assembled" if those "parts are in the possession or under the control of a person." *Id.* It is a crime to possess or transfer machine guns to any person who has not undergone the required registration and authorization process. *See* 18 U.S.C. § 922(b)(4); § 922(o)(1).

46.     Interpreting this language, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") clarified in 1982 that semiautomatic firearms (both rifles and pistols) that possess design features that allow them to easily be converted to automatic weapons with "simple modification or elimination of existing component parts" were "machineguns" under the NFA.[11] That is, even if a gun was not originally a machinegun, it qualifies as one under the NFA if it can be simply modified into one.

---

[10]     Violence Policy Center, *supra* note 6, at 10-11.
[11]     ATF Ruling 82-2; ATF Ruling 82-8.

47.     Two important developments occurred in 1994.  *First*, the U.S. military began using the M4 carbine—a version of the M16 with a shorter 14.5-inch barrel and a collapsible stock.  The M4 has slowly replaced the M16 in service because it is easier to use in close quarters, but still functions like the M16.  *Second*, Congress further acted to limit access by civilians to these weapons by passing a federal assault weapon ban, which sunset in 2004.

48.     As the federal assault rifle ban lapsed in 2004, the gun industry saw an opportunity to market these weapons of war to civilians.

b.  *Smith & Wesson Designs and Profits From Assault Rifles and Mass Shootings*

49.     Smith & Wesson introduced its line of M&P assault rifles in early 2006, shortly after the federal assault weapon ban sunset.  It designed the M&P rifle to mimic an M4 carbine.



*2006 Presentation to investors including the following quote: "If you're a fan of the M4A1 Carbine, I can assure you that the new M&P Carbine is as good as it gets."*

50.     Smith & Wesson explained that these "tactical rifles" or "black rifles" were "specifically designed to satisfy the functionality and reliability needs of global military and law

enforcement personnel."[12] But the company pitched them to the civilian market, stating: "[w]e also believe that our M&P rifle series fills a tremendous gap in the marketplace by delivering high-quality, feature-rich tactical rifles that will be readily available in commercial channels."[13]

51.     Not only were the M&P rifles "specifically designed to satisfy the functionality and reliability needs of global military and law enforcement personnel," but they have design features that allow them to be easily converted to fire automatically—without the need for advanced equipment or mechanical skills. Such modification—which is illegal—can be accomplished by: (i) replacing the manufacturer-installed, semiautomatic sear system inside the rifle with a third-party sear system that enables automatic fire, such as an M16 auto sear, a "drop-in auto sear," a "lightning link," a "swift link," or even a carefully shaped coat hanger; (ii) shaving down part of the manufacturer-installed sear system to change the way it functions; or (iii) retrofitting the weapon with a device that dramatically increases its rate of fire to mimic a machinegun's, including a bump stock, trigger crank, Hellfire device, forced-reset trigger, binary trigger, or similar attachment.

52.     Smith & Wesson chose to design the M&P15 assault rifles with features that allow the rifles to be easily modified to fire automatically, but manufactured, transferred and sold them in violation of the NFA and the Gun Control Act ("GCA"), since the company failed to fill out the appropriate transfer forms, get approval of the forms by the ATF, pay occupational and transfer taxes and—most critically—register the firearms with ATF.

53.     Instead of designing a new civilian rifle by altering the design of the military M4 carbine so that it could not be easily modified to fire automatically, Smith & Wesson essentially

---

[12]     Smith & Wesson Holding Corp., Annual Report at 4 (Form 10-K) (Jul. 16, 2007).
[13]     Violence Policy Center, *supra* note 6, at 3.

copied the design of a fully automatic weapon that is made for combat, not for any legitimate need of a law-abiding civilian.

54.     For Smith & Wesson, the addition of the M&P assault rifles to the company's lineup significantly contributed to its bottom line. In the early years of the product line, the company repeatedly bragged to investors about the strong "consumer response" to its "AR style tactical rifles."[14]

55.     In annual filings with the SEC for fiscal year 2012, Smith & Wesson estimated the domestic non-military firearm market for assault rifles to be $489 million. And according to the company, the sale of its M&P assault rifles accounted for $75.1 million in net sales—over 18% of its total net sales—a 3,650% increase from 2006.[15]

56.     While Smith & Wesson reaped the profits, the costs were borne by American civilians. In July 2012, a 24-year-old male murdered 12 people and wounded 70 others in an Aurora, Colorado movie theater with a Smith & Wesson M&P rifle. A few months later, in December 2012, a 20-year-old male murdered 26 people—including 20 young children—at Sandy Hook Elementary School, using another company's assault rifle.

57.     In its corporate filings that fiscal year, Smith & Wesson did not report any changes to its business practices as a result of these shootings. Instead, Smith & Wesson only stopped separately reporting its assault-rifle profits.[16] But the money kept rolling in: for fiscal year 2013, the company reported that it had captured 20 percent of the assault rifle market and that the increase in firearms sales was due in part "to fears of renewed legislative activity surrounding restrictions

---

[14]     *See, e.g., id* at 4.
[15]     Smith & Wesson Holding Corp., Annual Report at 1–4 (Form 10-K) (July 14, 2006);
         Smith & Wesson Holding Corp., Annual Report at 1–4 (Form 10-K) (June 28, 2012).
[16]     *See* Smith & Wesson Holding Corp., Annual Report at 1–4 (Form 10-K) (June 25, 2013).

on the sale or makeup of firearms."[17]  In other words, Smith & Wesson was profiting off the fear of stronger gun laws following the public outcry after the Aurora and Sandy Hook shootings.

58.     By fiscal year 2015, Smith & Wesson estimated that it had the "leading share" of the assault rifle market.[18]

59.     Then, on December 2, 2015, two attackers killed 14 people and seriously wounded 22 others at a Christmas party in San Bernardino, California.  Their arsenal included a Smith & Wesson M&P assault rifle.

60.     One week after the shooting, then-CEO James Debney announced that the company was increasing financial guidance for the fiscal year.[19]  Three months later, Debney told financial analysts that the company was "obviously doing everything we can to capitalize on the strong market" in the preceding fiscal quarter.[20]

61.     On February 14, 2018, shortly after 2:00 p.m., 19-year-old Nikolas Cruz arrived on the grounds of Marjory Stoneman Douglas High School in Parkland, Florida.  He used a Smith & Wesson M&P rifle that he had purchased at the age of 18 to murder 17 students and staff members and injure 17 others.

62.     In an investor call shortly thereafter, Debney acknowledged the tragedy, but did not announce any steps that the company would take to stop marketing M&P rifles to dangerous, impulsive teenagers like Cruz.

---

[17]    *Id.* at 34.

[18]    Smith & Wesson Holding Corp., Annual Report at 3 (Form 10-K) (Jun. 22, 2015); Smith & Wesson Brands, Inc., Annual Report at 4 (Form 10-K)(Jun. 19, 2020); Smith & Wesson Brands, Inc., Annual Report at 3 (Form 10-K) (Jun. 23, 2022).

[19]    Smith & Wesson Holdings Corp., Current Report (Form 8-K), Exhibit 99.1 at 4–5 (Tr. of Conference Call and Webcast Conducted on Dec. 8, 2015) (Dec. 9, 2015).

[20]    Smith & Wesson Holdings Corp., Current Report (Form 8-K), Exhibit 99.1 at 7 (Tr. of Conference Call and Webcast Conducted on Mar. 3, 2016) (Mar. 4, 2016).

63. In September 2018, a majority of voting shareholders passed a resolution requesting an investigation into Smith & Wesson's "activities related to gun safety measures and mitigation of harm associated with gun products, including. . . evidence of monitoring of violent events associated with products produced by" Smith & Wesson.[21] In the report that followed, Smith & Wesson stated that it engaged "an independent media monitoring firm" to "track violent events at which Smith & Wesson firearms were present" and would "continue with certain monitoring for at least one year to further test the[] initial results."[22] The report claimed that adopting the shareholders' requested safety measures was not worth it. Specifically, Smith & Wesson wrote: "[t]he Company's reputation as a strong defender of the Second Amendment is not worth risking for a vague goal of improving the company's reputation among non-customers or special interest groups with an anti-Second Amendment agenda."[23]

64. In fiscal year 2021, Smith & Wesson boasted of "develop[ing] a new and exciting consumer-focused marketing approach," and noted that it welcomed eight million first-time gun buyers.[24] As a result, Smith & Wesson's net sales surpassed $1 billion for the first time in its 169-year history.[25]

   c. *Smith & Wesson Intentionally, Unfairly, and Deceptively Markets the M&P Line to Civilians, including Teenagers and Young Adults*

65. Despite knowing that mass shootings have been repeatedly perpetrated by young men armed with its and other manufacturers' assault rifles, Smith & Wesson specifically and intentionally markets its M&P rifles in a way that appeals to adolescent and post-adolescent males.

---

[21]   American Outdoor Brands Corporation, Shareholder Requested Report on Product Safety Measures and Monitoring of Industry Trends at 3 (Feb. 8, 2019).
[22]   *Id.* at 5.
[23]   *Id.* at 4.
[24]   Smith & Wesson Brands, Inc., 2021 Annual Report: 2021 in Review (2021).
[25]   Smith & Wesson Brands, Inc., Annual Report at 4 (Form 10-K) (Jun. 17, 2021).

It has taken no steps to guard against the sale of these rifles to those who would foreseeably commit such violent acts.

66.     A recent investigation conducted by the U.S. House of Representatives' Committee on Oversight & Reform found that "despite [numerous] horrific mass shootings [with Smith & Wesson firearms], Smith & Wesson's marketing campaigns have consistently contained dangerous themes and messages."[26]

67.     Through its marketing and sales practices, Smith & Wesson willfully places profits over safety. Smith & Wesson does this in at least two ways.

68.     *First*, Smith & Wesson repeatedly markets its M&P rifles as closely associated with and/or endorsed by the U.S. military.  In fact, as stated above, the M&P brand name of Smith & Wesson's rifles stands for "Military & Police."[27]

69.     Starting from at least 2009, Smith & Wesson has advertised its M&P assault rifle as being the "chosen" firearm for on-duty service members:

---

[26]     Letter from Carolyn B. Maloney, Chairwoman of U.S. House Committee on Oversight and Reform, to Mark P. Smith, President and CEO of Smith & Wesson Brands, Inc., at 6 (August 1, 2022), *available at* https://perma.cc/DM57-QZGL.

[27]     According to Smith & Wesson, the name "M&P" comes from the company's Model 1899 *Military and Police* Revolver. *See* Smith & Wesson, History of M&P, *available at* https://perma.cc/L8QD-834U.



*2009*



*2010*



*Date Uknown*

70. As of 2018, the Smith & Wesson website prominently featured an image of an M&P rifle with the text "Military, Law Enforcement & Training" as an overlay:



*Screenshot from Smith & Wesson Homepage in 2018 via Wayback Machine*

71.     And recent Smith & Wesson marketing features individuals who appear to be active

U.S. military service members in full uniform carrying weapons that resemble M&P rifles:



*Image of an M&P rifle and an American flag superimposed over what appears to be an active-duty soldier. Instagram - @smithandwessoninc (Nov. 4, 2018)*





*Advertisements featuring what appears to be an active-duty U.S. soldier,*

*holding an M&P rifle.  (2019)*

72.     The intent of this branding and marketing campaign is to increase civilian sales by conveying the message that M&P rifles are approved, endorsed, and used by the U.S. military. While the promotions above offer U.S. service members a discount, the images Smith & Wesson chose to use deliberately—and misleadingly—show the weapons being used not in a civilian context but by what are made to appear to be members of the U.S. military on active military duty.

73.     These campaigns also falsely imply that Smith & Wesson's line of M&P rifles are the same standard, quality, or grade that the U.S. military uses.

74.     Smith & Wesson has referred to this marketing strategy of promoting an association between its products and the United States military and/or law enforcement officials as an effort to take advantage of the "halo" effect, which is intended to confer credibility to the M&P line of products in the eyes of civilian buyers by connecting these weapons to the military and law enforcement.[28]

75.     By cloaking products generally sold to the public in the mantle of revered members of the U.S. military and law enforcement, Smith & Wesson marketing suggests that buying these products will allow civilians to act like service members and engage in combat.

76.     For example, according to Smith & Wesson in its 2017 annual report, "Our M&P branded modern sporting rifles are specifically designed to satisfy the functionality and reliability needs of global military, law enforcement, and security personnel.  As a result, these long guns are popular with consumers as hunting and sporting target rifles and are sold through our sporting good distributors, retailers, and dealers."[29]

---

[28]     *See* Smith & Wesson Holdings Corp., Current Report (Form 8-K), Exhibit 99.1 at 11 (Tr. of Conference Call and Webcast Conducted on Sep. 1, 2016) (Sept. 2, 2016).

[29]     American Outdoor Brand Corp., Annual Report at 8 (Form 10-K) (Jun. 29, 2017).

77.     Smith & Wesson is not the only gun company to engage in such marketing. The National Shooting Sport Foundation ("NSSF")—whose members include Smith & Wesson—led a charge for the industry to call assault rifles "modern sporting rifles" in order to mitigate the (correct) association between the assault rifle and its violent purpose and past. As a result, the gun industry—including Smith & Wesson—began re-naming the rifle as a "modern sporting rifle" in order to promote a false narrative that the assault rifle was useful for hunting and sport shooting.

78.     The true use of the rifle is revealed, however, by the gun industry's continued push in advertising assault rifles with images of military and law enforcement. A 2020 study of gun company and influencer content on YouTube and Twitter found that "military, patriotic, and law enforcement themes" were "commonplace," and glorification of military gun use were easily found in contemporary gun advertising.[30]

79.     When it comes to Smith & Wesson, such advertising is false and misleading. Despite the plain suggestion that M&P rifles are used or endorsed by the military, approximately 90 percent of Smith & Wesson firearms, including M&P15 rifles, are sold through the domestic civilian consumer channels.[31]  Indeed, in every single 10-K filing from 2009 to 2016, the company

---

[30]     Lisa Jordan et al., *Characteristics of Gun Advertisements on Social Media: Systematic Search and Content Analysis of Twitter and YouTube Posts*, 22 J. MED. INTERNET RES.3. (Mar. 27, 2020), *available at* https://perma.cc/RC8E-C25C.

[31]     Smith & Wesson Holdings Corp., Annual Report at 7 (Form 10-K) (Jun. 28, 2012); Smith & Wesson Holdings Corp., Annual Report at 9 (Form 10-K) (Jun. 25, 2013); Smith & Wesson Holdings Corp., Annual Report at 10, 14–15 (Form 10-K) (Jun. 19, 2014); Smith & Wesson Holding Corp., Annual Report at 9 (Form 10-K) (Jun. 15, 2015); Smith & Wesson Holding Corp., Annual Report at 10 (Form 10-K) (Jun. 16, 2016); American Outdoor Brands Corp., Annual Report at 13 (Form 10-K) (Jun. 27, 2017); American Outdoor Brands Corp., Annual Report at 14 (Form 10-K) (Jun. 20, 2018); American Outdoor Brands Corp., Annual Report at 14 (Form 10-K) (Jun. 19, 2019); Smith & Wesson Brands, Inc., Annual Report at 17 (Form 10-K) (Jun, 19, 2020); Smith & Wesson Brands, Inc., Annual Report at 9 (Form 10-K) (Jun. 17, 2021); Smith & Wesson Brands, Inc., Annual Report at 9 (Form 10-K) (Jun. 23, 2022).

stated that it "ha[d] not [ ] secured any major contracts to supply firearms to any large domestic military agencies."[32]

80.    Additionally, information obtained in a 2020 Freedom of Information Act request, as well as a review of firearms contracts in the Federal Procurement Data System, appear to show the existence of only a single contract between Smith & Wesson and the military over the past decade—a 2012 order by the U.S. Army for 250 revolvers apparently destined for Thailand.

81.    A *second*, and related, way that Smith & Wesson markets its assault rifles to young, impulsive men is by appealing to their propensity for risk and excitement.

82.    For example, Smith & Wesson intentionally creates advertisements mimicking the first-person shooter aesthetic of popular video games like Call of Duty. First-person shooter games typically involve players, like the Shooter, shooting at targets—often human targets.



*Screenshot of the Shooter playing
Call of Duty in or around 2019*



*Screenshot of Smith & Wesson M&P
Advertisement originally published in 2015,
and still available online.*

---

[32]    Smith & Wesson Holdings Corp., Annual Report at 15 (Form 10-K) (Jun. 30, 2009); Smith & Wesson Holdings Corp., Annual Report at 17 (Form 10-K) (Jul. 1, 2010); Smith & Wesson Holdings Corp., Annual Report at 17-18 (Form 10-K) (Jun. 30, 2011); Smith & Wesson Holdings Corp., Annual Report at 10 (Form 10-K) (Jun. 28, 2012); Smith & Wesson Holdings Corp., Annual Report at 14 (Form 10-K) (Jun. 25, 2013); Smith & Wesson Holdings Corp., Annual Report at 14–15 (Form 10-K) (Jun. 19, 2014); Smith & Wesson Holding Corp., Annual Report at 12–13 (Form 10-K) (June 22, 2015); Smith & Wesson Holdings Corp., Annual Report at 13 (Form 10-K) (Jun. 16, 2016).



*Smith & Wesson M&P Rifle Advertisement originally published in 2015, a variation of which was published on Smith & Wesson's homepage as of June 2020.*

83.     The advertisement above promises "[a]n Experience You Have to Feel to Believe" and "[a] Lifetime Service Policy That Lets You Set Your Sights on Just One Thing—More Adrenaline." The ad also dramatizes the visual effect of the target exploding.

84.     One Smith & Wesson ad, which was first posted on YouTube in February 2015 and which appears to have aired on television, shows off M&P rifles from various "first person" points of view. The ad is titled "Get the Experience," and its byline is "Experience real-life first person shooting with the Smith & Wesson M&P rifle."[33] As a narrator tells potential consumers to "experience more adrenaline," a shooter loads an M&P rifle from the first-person shooter perspective with a high-capacity magazine. Another shooter prepares to aim their M&P rifle from a distance using an optic.

---

[33]     SMITH & WESSON, M&P RIFLE TV COMMERCIAL, "GET THE EXPERIENCE," *available at* https://perma.cc/K9GZ-9H8N.

 

85.    As far back as 2010, Smith & Wesson has been encouraging consumers to "Kick Brass" and to "burn through all the ammunition you want," while promising "Pure Adrenaline."



*Advertisement originally published by Smith & Wesson in or around 2010.*

86.    The strategy appears designed to exploit the attraction of adolescents and young adults to impulsive, thrill-seeking behavior.  And it is eerily reminiscent of the historical practices of the tobacco and alcohol industries, exploiting the vulnerability of young consumers to advertisements that promote thrill-seeking conduct in order to hook them early and convert them into lifelong purchasers of their products.[34]

---

[34]    *See* BOSTON UNIVERSITY CENTER ON ALCOHOL MARKETING AND YOUTH, Alcohol Advertising and Youth (2007) ("Research clearly indicates that, in addition to parents and peers, alcohol advertising and marketing have a significant impact on youth decisions to drink."); John J. Pierce et al., *Ass'n Between Receptivity to Tobacco Advertising and Progression to Tobacco Use in Youth and Young Adults in the PATH Study*, 172 JAMA

87.     In fact, in a December 2019 presentation to investors, Smith & Wesson described that its brand strategy for the M&P brand was to "focus[ ] on reaching the 'Hardcore' and 'Young Gun' segments" of the market.[35]

88.     For Smith & Wesson, the younger the shooter, the better. Industry analysis published by the NSSF recommends reaching potential consumers at an early age because, "[i]t appears that hunters and shooters who started at a young age derive more satisfaction from hunting and target shooting, compared to those who started later in life – in other words, some satisfaction becomes ingrained."[36]  In a 2017 investor call, then-CEO James Debney touted the company's shift to younger consumers, stating "demographics [are] changing for the better. It's good to see younger people interested in the shooting sports[.]"[37]

89.     To increase its profits, Smith & Wesson aims to hook young shooters at an early age, so they can become consumers later in life:



---

PEDIATR. 444 (May 2018) ("Our study reinforces that tobacco product marketing continues to be an important contributor to tobacco use among young people.").

[35]     American Outdoor Brand Corp., Investor Presentation at 17 (Dec. 2019).

[36]     NSSF, *Understanding Activities that Compete with Hunting and Target Shooting* at vii (2011), *available at* https://perma.cc/937M-VYH8.

[37]     American Outdoor Brands Corp., Current Report (Form 8-K) (March 2, 2017), Exhibit 99.1 at 15 (Tr. of Tr. of Conference Call and Webcast Conducted on Mar. 2, 2017).





90.     To market its M&P rifles, Smith & Wesson maintains an active presence on social media, through platforms such as Twitter, Instagram and YouTube.  Notably, it does not employ any age gates on its social media—or its website for that matter— that would prevent minors from accessing its marketing materials, even though platforms like Instagram are exceedingly popular with youth.  Nor does Smith & Wesson include any legal or regulatory disclosures on its social media accounts, including any warnings about the dangers of assault rifles.

91.     Instead, Smith & Wesson utilizes social media influencers who promote the M&P rifle's ability to do things like shoot ten shots fired into four different targets in 1.59 seconds.[38] Influencers teach followers how to use the Smith & Wesson M&P rifle when running from target to target while avoiding bullets—something that would only be useful in a combat situation.[39]

---

[38]     *See* Smith & Wesson, Inc., *Smith & Wesson M&P15 T Rifle with Jerry Miculek*, YOUTUBE (Apr. 21, 2017), https://perma.cc/3Y89-TBAM  (last visited July 21, 2022).

[39]     Provectus Group (@provestusgroup), INSTAGRAM (July 30, 2020), *available at* https://perma.cc/6PMK-KJJ6.

27

92.     Smith & Wesson knows or should know that its paid influencers are engaged in this conduct, particularly since, under the rules of the Federal Trade Commission, advertisers are liable for false or unsubstantiated statements made by their influencers.

93.     And Smith & Wesson shows no sign of slowing down. After a 17-year-old shooter infamously used an M&P assault rifle to kill two protesters at a racial justice rally in Kenosha, Wisconsin in 2021, Smith & Wesson introduced an "enhanced line" of assault rifles, promising "More Power," and telling users that the rifle can "shoot beyond 300 yards."[40]  In its marketing, Smith & Wesson encourages consumers to "step up" to buy the "Volunteer" assault rifle.[41]



*Smith & Wesson promotional materials introducing its "Volunteer" rifle series (2022).*

94.     It is no secret to Smith & Wesson that its marketing practices attract a category of consumers, including individuals like the Shooter, who threaten the safety of others—impulsive young men with militaristic delusions who desire dangerous assault weapons like the M&P15 to effectively execute their violent fantasies.

95.     If Smith & Wesson ever was unaware of these risks, the growing number of mass shootings involving assault rifles each year have amply demonstrated the results of its conduct.

---

[40]     Smith & Wesson, Inc., *The NEW Smith & Wesson Volunteer Rifle Series*, YOUTUBE (Jan. 18, 2022), *available at* https://perma.cc/R52L-ZJWD; *Volunteer Series*, SMITH & WESSON (last visited Sept. 26, 2022), *available at* https://perma.cc/VV7D-VMZ6.
[41]     *Id.*

From 2009 through May 2020, 50 percent of the 10 mass shootings with the highest count of gunshot injuries and deaths were perpetrated by male shooters who were between the ages of 19 and 26.[42] In the two years since then, that number has grown to 70 percent.[43]

96.    Similarly, Smith & Wesson knew or should have known in the last decade, mass shooters have used Smith & Wesson weapons as their weapon of choice:

| **Date** | **Location** | **Additional Description** | **Number Killed** | **Number Injured** | **Weapon** |
|---|---|---|---|---|---|
| 07/20/12 | Aurora, CO | Movie Theater Shooting | 12 | 70 | M&P 15 |
| 12/2/15 | San Bernardino, CA | Community Center | 14 | 22 | M&P 15 |
| 2/14/18 | Parkland, FL | Marjory Stoneman Douglas | 17 | 17 | M&P 15 |

97.    And as discussed in more detail below, Smith & Wesson knew that young men like the Shooter are generally more susceptible to advertising than adults, and that these young men are disproportionately prone to irresponsible, impulsive thrill-seeking behavior. Yet, it continued to market its assault rifles in a misleading and dangerous manner.

---

[42]    Smith & Wesson, Inc., *The NEW Smith & Wesson Volunteer Rifle Series*, YOUTUBE (Jan. 18, 2022), *available at* https://perma.cc/R52L-ZJWD; *Volunteer Series*, SMITH & WESSON (last visited Sept. 26, 2022), *available at* https://perma.cc/VV7D-VMZ6.

[43]    Complaint and Request for Investigation of Daniel Defense LLC from Everytown Law to Samuel Levine, Director, Fed. Tr. Comm'n, Bureau of Consumer Protection at 26-27 (July 15, 2022), *available at* https://perma.cc/SH3W-PJZD.

  d. *Smith & Wesson Knew that Adolescents and Young Adults are Prone to*
     *Impulsive, Risky, and Thrill-Seeking Behavior*

98.     It is well known that adolescents and young men between the ages of 15 and 24 are highly susceptible to product advertising and more likely than other age groups to engage in risky, thrill-seeking, violent, and impulsive behavior.

99.     Decades of scientific evidence demonstrate that the onset of intense, thrill-seeking urges associated with puberty outpaces the development of the area of the brain responsible for judgment and impulse control, which continues into young adulthood.[44]

100.    As a result, adolescents and post-adolescents have less capacity for mature judgment and self-control than older adults and are more likely to engage in risky behaviors.[45]

101.    Adolescents and young men are particularly receptive to advertisements that depict impulsive, thrill-seeking behavior.[46]

102.    Negative emotions such as anger, depression, and anxiety—which are more strongly felt by adolescents—can dilute the already weak control adolescents and post-adolescents exercise over their impulses and urges.[47]

---

[44]    *See, e.g.*, Cornelia Pechmann et al., *Impulsive and Self-Conscious: Adolescents' Vulnerability to Advertising and Promotion*, 24 J. PUB. POLICY & MARKETING 202, 203–07 (2005); *see also* Laurence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk Taking*, 28 DEVELOPMENTAL REV. 78 (2008); Agnieszka Tymula et al., *Adolescents' risk-taking behavior is driven by tolerance to ambiguity*, 109 PNAS 17135 (Oct. 16, 2012).

[45]    *Id.; see also* Glenn Thrush & Matt Richtel, *A Disturbing New Pattern in Mass Shootings: Young Assailants*, N.Y. TIMES (June 2, 2022), *available at* https://perma.cc/BK7L-SN9Y

[46]    *See* Pechmann et al., *supra* note 44, at 202, 214.

[47]    *See* Pechmann et al., *supra* note 44, at 207-09; *see also* Lisa Rapaport, *Emotional distress tied to weapon use for teens*, REUTERS (Feb. 5, 2016), *available at* https://perma.cc/G6Z7-KYVU; Renata Sikora, *Risk behaviors at late childhood and early adolescence as predictors of depression symptoms*, 17 CURRENT PROBLEMS OF PSYCHIATRY 173 (2016).

103.    Studies have further shown that this predilection for risky, thrill-seeking behavior extends to violent criminal behavior.  A disproportionate amount of violent crime in the United States is committed by individuals between the ages of 15 and 24, with 18 to 20-year-olds being nearly four times more likely to perpetrate a gun homicide than those 21-years-old or older.[48]  And as discussed above, adolescents and young men disproportionately represent the demographic of the most destructive mass shooters.

104.    Smith & Wesson, a "marketing-led business"[49] that employs scores of marketing employees and consultants, knows about, and seeks to exploit, adolescents' and young adults' susceptibility to product advertising.

105. In fact, in 2000, Smith & Wesson negotiated a settlement agreement with the federal government, two states, one county, and several cities that included a commitment not to "market any firearm in a way that would make the firearm particularly appealing to juveniles."[50] Although Smith & Wesson later asserted that the settlement was "not legally binding," it demonstrates Smith & Wesson's knowledge that marketing to youth is particularly risky.

106.    As the maker of assault rifles that have been used in multiple mass shootings, Smith & Wesson is aware that these age groups are more likely to engage in risky, thrill-seeking, violent, and impulsive behavior.

---

[48]    Brad J. Bushman et al., *Youth Violence: What We Know and What We Need to Know*, 71 AM. PSYCHOLOGIST 17, 19 (2016); *see also* Everytown for Gun Safety, *Permitless Carry: Carrying a Concealed Gun in Public with No Permit and No Training* (Feb. 2020), *available at* https://perma.cc/3D2X-PCWC.

[49]    Smith & Wesson Holdings Corp., Current Report (Form 8-K), Exhibit 99.1 at 12 (Tr. of Conference Call and Webcast Conducted on Mar. 3, 2016) (Mar. 4, 2016).

[50]    U.S. Dep't of Justice, *Smith & Wesson Settlement Agreement*, at 14–15 (Mar. 17, 2000), *available at* https://perma.cc/L4DT-DTWB.

107.    Despite this knowledge, Smith & Wesson continued marketing the M&P15 line in a manner that would appeal to thrill-seeking young men, who wanted the power and destruction of a military weapon, fully knowing and appreciating that the growth of the M&P line was due in part to its appeal to a younger demographic of users. Smith & Wesson's marketing foreseeably led to the mass shooting in Highland Park.

## II.    The Shooter Was the Type of Young Consumer Susceptible to Smith & Wesson's Deceptive & Unfair Marketing, and Was Enabled by His Father.

### a.    *The Shooter's Dark History*

108.    The Shooter was exactly the type of unstable and impressionable young consumer, obsessed with violence and filled with hatred and depressive thoughts, susceptible to Smith & Wesson's marketing, and more likely to engage in dangerous behavior. He was well within the category of consumers targeted by Smith & Wesson's unfair, deceptive, and unlawful marketing practices, and was, in fact, exposed to Smith & Wesson's marketing.

109.    The Shooter had a turbulent youth. Between 2009 and 2014, police officers visited the Shooter's home nearly 20 times, nine of which involved reports of domestic violence. Upon information and belief, he attended Highland Park High School but dropped out before graduating.

110.    The Shooter long demonstrated an interest in guns and other violent weapons.

111.    In April 2019, when the Shooter was 18 years old, he attempted to commit suicide with a machete, and law enforcement was called to the home.

112.    Later that year, in September, law enforcement again visited the home in response to alleged threats by the Shooter against a family member. At this time, police seized 16 knives, a dagger, and a sword from the Shooter after a family member reported to the police that he planned to "kill everyone." The Shooter was not charged with a crime, but a "clear and present danger report" was filed with the Illinois State Police.

113.    The Shooter's obsession with violence and weapons is well-documented.  A review of his phone after the Fourth of July shooting showed photos of gore, dismembered bodies, and decapitated people.  The Shooter also documented his alarming obsession with weapons and violence online, on his own websites and on various social media platforms, including Facebook, Instagram, YouTube, TikTok, Tumblr, Discord and Reddit, among others.

114.    He would regularly post videos of himself playing Call of Duty, such as:

 

115.    He also posted violent songs and music videos on platforms such as Spotify, YouTube and Apple Music, under the stage name "Awake the Rapper."  YouTube videos prepared by or featuring the Shooter show his interest in firearms and are clearly tied to the militarized or murderous use of weapons.  His obsession with violence, including in the guise of military-style missions, made him a prime target for Smith & Wesson's youthful, adrenaline-fueled, military-style marketing and advertising.

116.    In one video, posted in January 2019, he rapped, "When I die, fuck it, I want to go to hell."  In another music video, titled "Toy Soldier," he raps, "fuck this world."  The animated video for "Toy Soldier" opens with a student texting in class.  Then, images of a heavily armed shooter entering a school and opening fire are cut between scenes of him battling police outside. The shooter is seen lying in a pool of blood in the final scene.



117.    In another video prepared by and/or featuring the Shooter titled "On my Mind," the Shooter is depicted holding the American flag while wearing tactical gear inside a vacant classroom.



118.    In yet another video prepared by the Shooter, he raps alongside clips of what appears to be him carrying a weapon, "Like a sleepwalker, I am breaking through no matter what."



119.    In October 2021, the Shooter posted an ominous video, titled "Are You Awake?" Over flashing images of a massacre with an assault rifle, he rapped,

> I need to just do it. It is my destiny. Everything has led up to this.
> Nothing can stop me, not even myself. Is there such a thing as free will?

120.    The Shooter's obsession with violence and firearms was not limited to music videos. In the backyard of his mother's Highland Park home, the Shooter filmed himself painting a full-sized soldier, with a yellow smiley face for a head, brandishing an assault rifle.



121.    On June 2, 2020, the Shooter joined the message board "Documenting Reality," in which he gave himself the rank "Master Gunnery Sergeant." He used this platform to engage in hateful speech and to discuss graphic depictions of death:



122.    The Shooter's obsession with firearms was clear: his phone contained numerous photos of himself posing with guns, sometimes wearing a "Siege" style mask, and sometimes wearing body armor.  He was ready to go to war—just as Smith & Wesson told him he could.

b.    *The Reckless FOID Application Submitted by the Crimo Defendants*

123.    In December 2019, at the age of 19, the Shooter applied for a FOID card that was sponsored by his father.

124.    In order to sponsor his son's FOID card application, the Shooter's Father had to sign a sworn affidavit that states that the Shooter's Father "underst[ood] [he] shall be liable for any damages resulting from the minor applicant's use of firearm or firearm ammunition."

125.    As required by Illinois law, an applicant for a FOID card must show, among other things, that they are "[n]ot a person whose mental condition is of such a nature that it poses a clear and present danger to the applicant, or any other person or the community."

126.    Upon information and belief, the application did not include any information about the Shooter's troubled behavior or his designation as a "clear and present danger."

127.    The Shooter's FOID card application was approved in January 2020, allowing him to purchase firearms in Illinois.

36

### III.  Bud's Gun Shop and Red Dot Arms Turn Blind Eyes.

128.  On or around June 9, 2020, the Shooter would purchase his first firearm. By the end of July 2020, the Shooter had acquired an arsenal. Not only had he acquired the Smith & Wesson M&P rifle that he would use for the shooting, he also purchased a Kel-Tec SUB2000, a Remington 700, and a shotgun.

129.  In June or July 2020, the Shooter went online to Bud's Gun Shop, to purchase a firearm that would enable him to live out his fantasy of being a "Master Gunnery Sergeant."

130.  Upon information and belief, the Shooter purchased an M&P15 because he was influenced and enticed by Smith & Wesson's unfair and deceptive marketing.

131.  Bud's Gun Shop's website featured Smith & Wesson marketing for M&P rifles and, upon information and belief, the Shooter was exposed to, and influenced by, these promotional materials.



*Screenshot from official Smith & Wesson M&P Rifle video hosted on Budsgunshop.com in 2020.*

132.  In order to purchase the weapon, the Shooter would have needed to provide his address to Bud's Gun Shop—first when setting up his account, and then when listing his billing address—making the retailer aware that the Shooter was a resident of Highland Park or Highwood, Illinois. Bud's Gun Shop sold the M&P assault rifle to the Shooter despite the fact that it is illegal for residents of both Highwood and Highland Park to acquire and possess assault weapons.

133.    Bud's Gun Shop then shipped the murder weapon to Red Dot Arms, a gun dealer located in Illinois, which transferred the assault rifle to the Shooter.  In the summer of 2020, Red Dot Arms transferred the M&P rifle to the Shooter after conducting a background check and verifying the ID of the Shooter.

134.    Upon information and belief, both the federal transaction form and the Shooter's ID would have shown that he resided in Highland Park or Highwood, both of which prohibited the Shooter from acquiring or possessing an assault weapon like the M&P rifle.

135.    In short order, the Shooter purchased at least three other firearms through Red Dot Arms—making him a repeat customer of the dealer.

**IV.    Lead Up to the Fourth of July Shooting**

136.    The Shooter posted videos of what appears to be a portion of Highland Park's Fourth of July Parade on his social media almost a year before the shooting.

137.    According to the ADL's Center on Extremism, the Shooter stopped posting on most of his social media accounts several months prior to the shooting.

138.    Approximately a week before the shooting, he was seen investigating rooftop access in a building on Central Avenue in Highland Park.

139.    In the days before the shooting, he posted hateful messages on the Documenting Reality message board:









140.    On July 3, 2022, he wrote himself a note on his phone outlining the steps required to conceal his identity during the attack.

141.    On or before the morning of July 4, 2022, the Shooter packed his firearms, accessories, and three 30-round magazines in preparation to bring Smith & Wesson's promises of limitless and relentless power into fruition.

142.    On or around 8:30 a.m. on July 4, 2022, the Shooter was seen riding around the intersection of Central Avenue and 2nd Street on his bike, casing the scene before the Highland Park Fourth of July parade started.

143.    He approached the Ross Cosmetics building, a local store on the northwest corner of Central Avenue and 2nd Street in Highland Park, Illinois. The Shooter gained access to the rooftop of the building by using an unsecured ladder attached to it.

144. Starting at or around 10:14 a.m., using the Smith & Wesson M&P assault rifle, the Shooter fired a total of 83 shots indiscriminately at the hundreds of people gathered to watch and participate in the Highland Park Fourth of July Parade.

145. Consistent with Smith & Wesson's marketing strategy of "kick[ing] brass" and "burn[ing] through. . .ammunition," the Shooter chose his M&P15 to inflict the most damage possible on the maximum number of people. While he owned numerous other firearms, the M&P15 was his weapon of choice. Upon information and belief, he made this choice because of its militaristic qualities and its perceived fit for carrying out his mission of inflicting the most violence possible.

146. After unloading the barrage of bullets, he concealed the weapon in a red blanket and dropped it behind the building as he fled during the mayhem. The Shooter proceeded to walk to his mother's home and took her car to escape. He was apprehended by the police at approximately 7:40 p.m. At the time of his arrest, seven other firearms were collected from him.

147. Smith & Wesson's deceptive and unfair marketing acts and practices increased the level of violence and lethality of the Highland Park Fourth of July shooting by putting in the Shooter's hands a deadly weapon designed for mass death.

## V.    The Impact of the Shooting on the Tenorio-Melgar Family

148. Amelia Tenorio, Antonio Melgar, and C.M. were excited to go to the July 4th Parade in Highland Park after a two-year hiatus because of the pandemic. They arrived around 10:00 a.m. and were surprised to find good seats along the parade route right in front of Gearheads near the corner of Central Avenue and 2nd Street.

149. The family was enjoying the parade until the shooting started at or around 10:14 a.m. Sitting near the front entrance of Gearheads, Amelia quickly rushed to get her young son,

C.M., to cover inside Gearheads. Despite her efforts, Amelia was stunned with a sudden onset of pain when she was grazed in the leg by a bullet, then became overwhelmed with emotion when she realized that C.M. was also shot in the leg. Overwhelmed with pain but running on adrenaline, the family found cover at Gearheads, where they remained together until Amelia and C.M. were taken to Highland Park Hospital to receive emergency medical treatment.

150.    On the whole for Amelia, Antonio, and C.M., the mental recovery from the shooting has been difficult. They are having trouble participating in public, crowded events due to fear of another massacre. The shooting plays on a loop for them, and it's not uncommon for anyone of them to burst into tears when something triggers a memory of the shooting. The wounds of that day –both physical and mental –are enduring.

**COUNT I**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act - Unfairness**
**815 ILCS 505/2**
***(All Plaintiffs v. Smith & Wesson Defendants)***

151.    Plaintiffs incorporate paragraphs 1 through 16 of the Introduction section, paragraphs 17 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdiction section, and paragraphs 36 through 150 of the General Allegations section, as if fully set forth herein.

152.    Pursuant to Section 2 of the Illinois Consumer Fraud Act, it is unlawful for any company to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices, including, but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce."

153.    Smith & Wesson's marketing campaigns targeted at civilian adolescent and post-adolescent males are unfair and unlawful because they (i) offend public policy; (ii) are immoral, unethical, oppressive or unscrupulous; and (iii) cause substantial injury to innocent civilians through conduct that is directed at the consumer market.

154.    Smith & Wesson sells and promotes its line of assault rifles, which are designed for military and law enforcement personnel, by intentionally and unfairly targeting the propensity of young men for risk-taking, impulsive behavior.

155.    While military and law enforcement personnel who utilize these types of weapons are highly trained, Smith & Wesson knows that civilians are not required to undergo similar—or any—training before utilizing their assault rifles.

156.    Yet, among other things, the company promises young civilian men that these assault rifles will offer "more adrenaline."

157.    Smith & Wesson models its marketing videos after first-person shooter games despite the risk that a certain subset of young men who play these games will want to act them out in real life.

158.    Smith & Wesson's marketing targets high-risk, young users through social media posts that harness images and themes popular among young people like first-person shooter games.

159.    Smith & Wesson utilizes influencers on social media who show these young civilian consumers how to use the M&P rifles in combat-like situations.

160.    Smith & Wesson's unfair marketing was a substantial and foreseeable factor in causing the Shooter to select and utilize the M&P rifle to try to live out his obsession with violence.

161.    In its marketing, Smith & Wesson does not identify its M&P assault rifles as NFA weapons, leading people to believe that they can obtain these weapons without complying with the NFA's requirements.

162.    At all relevant times, Smith & Wesson knew or should have known that since it began marketing the M&P line of rifles, the United States had been plagued by a series of deadly mass shootings, many of which were at the hands of disturbed, violent young men wielding semiautomatic assault rifles, including the M&P rifle.  Since 2009, there have been over 250 mass shootings in the United States where four or more people were shot, excluding the perpetrator.

163.    Yet Smith & Wesson continued to market the M&P rifle line in the manner set forth in this complaint despite evidence of their increasing use in mass shootings.

164.    Smith & Wesson has made no material changes to its marketing and sales practices based on the increase in mass shootings.  Smith & Wesson's M&P rifle sales increase following mass shootings because segments of Smith & Wesson's consumer base fear that tighter gun regulations will be enacted.

165.    Smith & Wesson marketed the M&P line of rifles without regard for public safety.

166.    Smith & Wesson marketed in the above manner directly and through third parties.

167.    Smith & Wesson violated both the NFA and the Gun Control Act ("GCA") by manufacturing, transferring, and selling these weapons without filling out the appropriate transfer forms, getting approval of the forms by the ATF, paying occupational and transfer taxes or registering the firearms.

168.    As a direct and proximate result of the aforementioned conduct, Plaintiffs have sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

169.    As a direct and proximate result of the aforementioned conduct and breach of duty, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

170.    Although Plaintiffs are not consumers of Smith & Wesson's M&P rifles, they nevertheless have standing to recover under the Consumer Fraud Act, which does not require a business relationship for those who have suffered damages resulting from conduct that is directed toward the market and that otherwise implicates consumer protection concerns.

171.    Accordingly, Plaintiffs are entitled to recovery against Smith & Wesson in an amount to be determined at trial.

WHEREFORE, Plaintiffs, AMELIA TENORIO, individually and as parent and next friend of C.M., and ANTONIO MELGAR, individually and as parent and next friend of C.M., pray for judgment against Defendants, SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

## COUNT II
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act - Deception
### 815 ILCS 505/2
### (*All Plaintiffs v. Smith & Wesson Defendants*)

172.    Plaintiffs incorporate paragraphs 1 through 16 of the Introduction section, paragraphs 17 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdiction section, and paragraphs 36 through 150 of the General Allegations section, as if fully set forth herein.

173.     Pursuant to Section 2 of the Illinois Consumer Fraud Act, it is unlawful for any company to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices, including, but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce."

174.     Section 2 of the Illinois Consumer Fraud Act also prohibits "the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act.'"

175.     Smith & Wesson engaged in marketing and promotion campaigns deceptively associating its line of M&P rifles with United States military personnel to create the false impression that its products were utilized and/or endorsed by these reputable users, and to target a class of consumers at particular risk to use assault rifles for mass shootings.

176.     Smith & Wesson improperly marketed an association between its M&P line of rifles and U.S. military personnel in a misleading and false manner.

177.     Through its marketing of M&P rifles, Smith & Wesson misrepresents by implication that it is affiliated with the U.S. military. In particular, Smith & Wesson's advertising includes imagery, branding, and messaging that would cause consumers to believe that its rifles are endorsed and widely used by the U.S. military, when there is no evidence that this is true.

178.     Smith & Wesson marketed its M&P civilian line of rifles by promoting its militaristic uses.

179.     Smith & Wesson's marketing glorified the military design, functionality and appearance of its M&P rifles. In fact, an investigation conducted in 2022 by the House of

Representatives' Committee on Oversight and Reform found that Smith & Wesson's advertisements "emphasize the AR-15-style rifle's military roots[.]"[51]

180.    By engaging in such conduct, Smith & Wesson impliedly misrepresented and overstated that the U.S. military endorses or uses Smith & Wesson's M&P assault rifles, causing a likelihood of confusion and misunderstanding as to any military sponsorship, use, or approval of the company's M&P rifles.

181.    Smith & Wesson's marketing campaigns are also deceptive because they falsely imply that the M&P rifles are of a same standard, quality, or grade that the U.S. military uses.

182.    Smith & Wesson's marketing campaigns are also deceptive because they omit the fact that its M&P rifles are NFA weapons and require registration, approval, and payment of taxes before they can be possessed.

183.    Smith & Wesson's failure to identify their M&P rifles as NFA weapons qualifies as concealment, suppression, or omission of a material fact.

184.    Upon information and belief, Smith & Wesson failed to identify its M&P rifles as NFA weapons with the intent that consumers rely upon this concealment, suppression, or omission.

185.    At all relevant times, Smith & Wesson knew or should have known, that since it began marketing the M&P line of rifles, the United States had been plagued by a series of deadly mass shootings, many of which were at the hands of disturbed, violent young men wielding semiautomatic assault rifles, including the M&P rifle.

186.    Yet Smith & Wesson continued to market the M&P rifle line in the manner set forth in this complaint despite evidence of their increasing use in mass shootings.

---

[51]    Letter from Carolyn B. Maloney, Chairwoman of U.S. House Committee on Oversight and Reform, to Mark P. Smith, President and CEO of Smith & Wesson Brands, Inc., at 6 (August 1, 2022), *available at* https://perma.cc/DM57-QZGL.

187.    Smith & Wesson marketed the M&P line of rifles without regard for public safety.

188.    Smith & Wesson marketed in the above manner directly and through third parties.

189.    Smith & Wesson marketed its rifles in a way that attracted and enabled dangerous persons like the Shooter.

190.    Smith & Wesson's deceptive marketing was a substantial and foreseeable factor in causing the Shooter to select and utilize the M&P rifle to try to live out his obsession with violence.

191.    As a direct and proximate result of the aforementioned conduct, Plaintiffs have sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

192.    As a direct and proximate result of the aforementioned conduct and breach of duty, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

193.    Although Plaintiffs are not consumers of Smith & Wesson's M&P rifles, they nevertheless have standing to recover under the Consumer Fraud Act, which does not require a business relationship for those who have suffered damages resulting from conduct that is directed toward the market and otherwise implicates consumer protection concerns.

194.    Accordingly, Plaintiffs are entitled to recovery against Smith & Wesson in an amount to be determined at trial.

WHEREFORE, Plaintiffs, AMELIA TENORIO, individually and as parent and next friend of C.M., and ANTONIO MELGAR, individually and as parent and next friend of C.M., pray for judgment against Defendants, SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the

Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

**COUNT III**
**Violation of The Illinois Uniform Deceptive Trade Practices Act**
**815 ILCS 510/2, *et seq.***
***(All Plaintiffs v. Smith & Wesson Defendants)***

195.    Plaintiffs incorporate paragraphs 1 through 16 of the Introduction section, paragraphs 17 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdiction section, and paragraphs 36 through 150 of the General Allegations section, as if fully set forth herein.

196.    Section 2(a), subparagraphs 2, 5, 7, and 12 of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, et seq. (IUDTPA), provides that "[a] person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

*          *          *

(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;

*          *          *

(7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;

*          *          *

(12)    engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

48

197.    Smith & Wesson engaged in marketing and promotion campaigns deceptively associating its line of M&P rifles with U.S. military personnel to create the false impression that its rifles were utilized and/or endorsed by these reputable users, and to target a class of consumers at particular risk to use assault rifles for mass shootings.

198.    Smith & Wesson improperly marketed an association between its M&P line of rifles and U.S. military personnel in a misleading and false manner.

199.    Through its marketing of M&P rifles, Smith & Wesson misrepresented by implication that it is affiliated with the U.S. military.  In particular, Smith & Wesson's advertising includes imagery and messaging that would cause consumers to believe that its products are endorsed and widely used by the U.S. military, when there is no evidence that this is true.

200.    Smith & Wesson marketed its M&P civilian line of rifles by promoting its militaristic uses.

201.    Smith & Wesson's marketing glorified the military design, functionality, and appearance of its M&P rifles.

202.    By engaging in such conduct, Smith & Wesson impliedly misrepresented and overstated that the U.S. military endorses or uses Smith & Wesson's M&P assault rifles and Smith & Wesson exercises undue influence over a population that is particularly at risk to fall prey to this deceptive marketing.

203.    Smith & Wesson's marketing campaigns are deceptive because they cause a likelihood of confusion and misunderstanding as to any military sponsorship, use, or approval of the company's M&P rifles.

204.    Smith & Wesson's marketing campaigns are also deceptive because they falsely imply that the M&P rifles are of a same standard, quality, or grade that the U.S. military uses.

205.     Smith & Wesson's marketing campaigns are also deceptive because they omit the fact that its M&P rifles are NFA weapons and require registration, approval, and payment of taxes before they can be possessed.

206.     Smith & Wesson's failure to identify their M&P rifles as NFA weapons qualifies as concealment, suppression, or omission of a material fact.

207.     Upon information and belief, Smith & Wesson failed to identify its M&P rifles as NFA weapons with the intent that consumers rely upon this concealment, suppression, or omission.

208.     At all relevant times, Smith & Wesson knew or should have known that since it began marketing the M&P line of rifles, the United States had been plagued by a series of deadly mass shootings, many of which were at the hands of disturbed, violent young men wielding semiautomatic assault rifles, including the M&P rifle.

209.     Yet Smith & Wesson continued to market the M&P rifle line in the manner set forth in this complaint despite evidence of their increasing use in mass shootings.

210.     Smith & Wesson marketed the M&P line of rifles without regard for public safety.

211.     Smith & Wesson marketed in the above manner directly and through third parties.

212.     Smith & Wesson marketed its rifles in a way that attracted and enabled dangerous persons like the Shooter.

213.     Smith & Wesson's deceptive marketing was a substantial and foreseeable factor in causing the Shooter to select and utilize the M&P rifle to try to live out his obsession with violence.

214.     Smith & Wesson's violation of IUDTPA was a proximate cause of Plaintiffs' harms, including physical pain, mental suffering, loss of enjoyment of life, anxiety and severe emotional distress.

215.    Smith & Wesson's violation of IUDTPA was a proximate cause of Plaintiffs' economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

216.    Smith & Wesson's conduct, as set forth above, occurred prior to and continued through and after July 4, 2022.  As a result, Smith & Wesson continues to violate IUDTPA by continuing to perpetuate the misleading marketing of its assault rifles, and these products continue to pose a threat to all members of the public, including Plaintiffs.

217.    As a result, Plaintiffs seek an injunction from this Court against Smith & Wesson, requiring it to cease its deceptive marketing campaigns.

WHEREFORE, Plaintiffs, AMELIA TENORIO, individually and as parent and next friend of C.M., and ANTONIO MELGAR, individually and as parent and next friend of C.M., pray for judgment against Defendants, SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., for an injunction requiring them to cease its deceptive marketing campaigns, including:

   i.    prohibiting Smith & Wesson from targeting the marketing of its AR-15-style rifles to children and young adults;

   ii.   prohibiting Smith & Wesson  from using military, branding imagery or references in such advertising;

   iii.  requiring Smith & Wesson  to use age gates on social media when promoting its AR-15-style rifles on social media;

   iv.   requiring Smith & Wesson to include warnings in all advertisements of AR-15-style  rifles regarding the appropriate uses and inherent dangers of such products;

   v.    and requiring it to disclose when its advertisements feature actors;

plus fees and costs of bringing this action.

## COUNT IV
### Negligence
### (*All Plaintiffs v. Smith & Wesson Defendants*)

218.     Plaintiffs incorporate paragraphs 1 through 16 of the Introduction section, paragraphs 17 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdiction section, paragraphs 36 through 150 of the General Allegations section, paragraphs 152 through 167 of Count I, and paragraphs 173 through 190 of Count II, as if fully set forth herein.

219.     At all relevant times, Smith & Wesson is and has been subject to at least the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.

220.     In fact, because Smith & Wesson is engaged in the highly risky activity of marketing assault rifles, it has a heightened duty to not expose others to foreseeable harm.

221.     Smith & Wesson has a duty to exercise reasonable care in marketing all firearms, including its M&P assault rifles, and to refrain from engaging in any activity creating a reasonably foreseeable risk of injury to others.  Breach of this duty constitutes negligence.

222.     At all relevant times, Smith & Wesson owed a duty to the public and Plaintiffs to market its firearms in a commercially reasonable manner.  As the manufacturer and marketer of the M&P15 assault rifle series, which it designed specifically for military and law enforcement professionals, Smith & Wesson had a duty to refrain from misleadingly and unfairly marketing these firearms in the manner described above to teenagers and young civilian adults who are foreseeably likely to handle these military-style weapons irresponsibly.  Breach of this duty constitutes negligence.

223.     Smith & Wesson knows, or should know, that adolescents and young adults are more prone to impulsive and risky behavior, including violent behavior, than other age groups.

224.    Smith & Wesson knows, or should know, that adolescents and young adults are more susceptible to claims made in advertising than older age groups.

225.    Smith & Wesson knows, or should know, that the most destructive mass shootings are disproportionately committed by adolescents and young adults, and that the weapon of choice for such shooters is often an AR-15 rifle.

226.    As evidenced by its settlement in 2000, Smith & Wesson knows, or should know, that irreparable harm has been and would be caused by marketing firearms in a way that would make them particularly appealing to juveniles.

227.    Thus, Smith & Wesson knows, or has reason to know, of the foreseeable risk that marketing of its M&P assault rifles to civilian adolescents and young adults using military and law enforcement imagery and references and appeals to increasing their adrenaline will inspire or encourage such consumers to choose M&P rifles for use in mass shootings.

228.    Smith & Wesson has breached its duty of care by choosing—in the face of this foreseeable risk—to negligently and misleadingly market its M&P rifles to teenagers and young adults.

229.    By engaging in the above conduct, Smith & Wesson knowingly violated the Illinois Consumer Fraud Act and Illinois Uniform Deceptive Trade Practice Act.

230.    Upon information and belief, Smith & Wesson's violations of the above laws influenced the Shooter's selection of his Smith & Wesson M&P15 rifle for use in his attack at the Highland Park Fourth of July Parade.

231.    In addition, Smith & Wesson knowingly violated both the NFA and GCA by manufacturing, transferring, and selling these weapons without filling out the appropriate transfer

forms, getting approval of the forms by the ATF, paying occupational and transfer taxes, or registering the firearms.

232.    Upon information and belief, the Smith & Wesson M&P rifle used by the Shooter at the Highland Park Fourth of July Parade was a machinegun because it had design features that would allow the firearm to be easily modified or converted into a machinegun—without the need for advanced equipment or mechanical skills.

233.    However, Smith & Wesson marketed the rifle as not requiring NFA paperwork, and, upon information and belief, it manufactured and transferred the rifle without complying with any of the NFA's requirements.

234.    Upon information and belief, if Smith & Wesson had complied with the requirements of the NFA, the Shooter would not have been able to access the weapon.

235.    Smith & Wesson's negligence and knowing violations of law were a direct and proximate cause of harm to Plaintiffs, by influencing and permitting the Shooter to purchase the M&P rifle and use it to fire upon parade-goers on July 4, 2022.

236.    As a direct and proximate result of the aforementioned conduct and breach of duty, Plaintiffs have sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

237.    As a direct and proximate result of the aforementioned conduct and breach of duty, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

238.    Accordingly, Plaintiffs are entitled to recovery against Smith & Wesson in an amount to be determined at trial.

WHEREFORE, Plaintiffs, AMELIA TENORIO, individually and as parent and next friend of C.M., and ANTONIO MELGAR, individually and as parent and next friend of C.M., pray for judgment against Defendants, SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

**COUNT V**
**Negligence**
***(All Plaintiffs v. Gun Store Defendants)***

239.     Plaintiffs incorporate paragraphs 1 through 16 of the Introduction section, 17 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdictional section, and paragraphs 36 through 150 of the General Allegations section, as if fully set forth herein.

240.     At all relevant times, the Gun Store Defendants were subject to the general duty imposed on all persons and entities to act reasonably not to expose others to reasonably foreseeable risks of injury.

241.     In fact, the Gun Store Defendants, as sellers of lethal products, are subject to the highest duty of care because of the danger their products can cause.

242.     The Gun Store Defendants have a duty to exercise reasonable care in marketing, distributing, and selling firearms and large capacity magazines, and to refrain from engaging in any activity creating reasonably foreseeable risk of injury to others.  Breach of this duty constitutes negligence.

243.     In or around June or July 2020, Bud's Gun Shop sold the Smith & Wesson M&P rifle to the Shooter through an online transaction.

244. Upon information and belief, to consummate this sale, the Shooter provided Bud's Gun Shop with his address, when he created an account and when he provided the billing address associated with his method of payment.

245. The Shooter resided in either Highland Park, Illinois or Highwood, Illinois, and, upon information and belief, the method of payment would have been associated with one of the two addresses.

246. Both Highland Park and Highwood make it illegal to "manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any assault weapon or large capacity magazine." HIGHWOOD, ILL., CODE OF ORDINANCES § 6-7-2(A) (2021); HIGHLAND PARK, ILL., CODE OF ORDINANCES § 136.005 (2021).

247. The M&P rifle purchased by the Shooter is an assault weapon pursuant to both the Highland Park and Highwood laws.

248. Yet, despite the fact that Bud's Gun Shop knew that the Shooter resided in Highland Park or Highwood, where it is illegal to acquire or possess an assault weapon, it sold the M&P rifle to the Shooter, thereby knowingly aiding and abetting the violation of the ordinances.

249. Bud's Gun Shop then shipped the M&P rifle to Red Dot Arms for Red Dot Arms to complete the transfer to the Shooter.

250. In June or July 2020, Red Dot Arms transferred the M&P rifle to the Shooter after, upon information and belief, conducting a background check and verifying the Shooter's identification.

251. Both the federal transaction form and the Shooter's ID should have shown that he resided in either Highland Park or Highwood, both of which prohibited the Shooter from acquiring or possessing an assault weapon like the M&P rifle.

252. Upon information and belief, despite knowing that the Shooter resided in a municipality that prohibited the possession of assault weapons, Red Dot Arms transferred the M&P rifle to the Shooter, thereby knowingly aiding and abetting the violation of the ordinances.

253. Both Gun Store Defendants are federally licensed gun dealers, therefore they are charged with and obligated to know the relevant firearm laws. In fact, among numerous other resources made available to them, is a collection of State Laws and Published Ordinances, which contains state and local laws applicable to firearm sales—including the Highwood and Highland Park Assault Weapon Ban Ordinances.

254. In addition, the Gun Store Defendants knowingly violated both the NFA and GCA by transferring and selling these weapons without filling out the appropriate transfer forms, getting ATF approval of the forms, paying occupational and transfer taxes, or registering the firearms.

255. Upon information and belief, the Smith & Wesson M&P assault rifle used by the Shooter at the Fourth of July Parade in Highland Park was a machinegun because it has design features that would allow the firearm to be easily modified or converted into a machinegun— without the need for advanced equipment or mechanical skills .

256. However, the Gun Store Defendants transferred the rifle without complying with any of the NFA's requirements.

257. Upon information and belief, if the Gun Store Defendants had complied with the requirements of the NFA, the Shooter would not have been able to access the weapon.

258. The Gun Store Defendants' negligence and knowing violations of law were a direct and proximate cause of harm to Plaintiffs, by causing the Shooter to gain unlawful possession of an assault weapon, which he used to shoot and terrify Plaintiffs.

259.     As a direct and proximate result of the aforementioned conduct and breach of duty, Plaintiffs have sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

260.     As a direct and proximate result of the aforementioned conduct and breach of duty, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

261.     Accordingly, Plaintiffs are entitled to recovery against the Gun Store Defendants in an amount to be determined at trial.

WHEREFORE, Plaintiffs, AMELIA TENORIO, individually and as parent and next friend of C.M., and ANTONIO MELGAR, individually and as parent and next friend of C.M., pray for judgment against, pray for judgment against Defendants, BUDSGUNSHOP.COM, LLC and RED DOT ARMS, INC., for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

## COUNT VI
### Aiding & Abetting
### (*All Plaintiffs v. Gun Store Defendants*)

262.     Plaintiffs incorporate paragraphs 1 through 16 of the Introduction section, 17 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdictional section, and paragraphs 36 through 150 of the General Allegations section, as if fully set forth herein.

263.     Both Gun Store Defendants aided and abetted the Shooter's acquisition of an illegal assault rifle, as well as the resulting mass shooting at the Highland Park Fourth of July parade, making them liable for the tort of aiding and abetting.

264.    In or around June or July 2020, Bud's Gun Shop sold a Smith & Wesson M&P rifle to the Shooter through an online transaction.

265.    Upon information and belief, to consummate this sale, the Shooter provided Bud's Gun Shop with his address when he created an account and when he provided the billing address associated with his method of payment.

266.    The Shooter resided in either Highland Park, Illinois or Highwood, Illinois, and, upon information and belief, the method of payment would have been associated with one of the two addresses.

267.    Both Highland Park and Highwood make it illegal to "acquire or possess any assault weapon or large capacity magazine." HIGHWOOD, ILL., CODE OF ORDINANCES § 6-7-2(A) (2021); HIGHLAND PARK, ILL., CODE OF ORDINANCES § 136.005 (2021).

268.    The M&P rifle purchased by the Shooter is an assault weapon pursuant to both the Highland Park and Highwood laws.

269.    Yet, despite the fact that Bud's Gun Shop knew that the Shooter resided in Highland Park or Highwood, where it is illegal to acquire or possess an assault weapon, it sold the M&P rifle to the Shooter, thereby knowingly aiding and abetting the violation of the ordinances.

270.    Upon information and belief, Bud's Gun Shop then shipped the M&P rifle to Red Dot Arms for Red Dot Arms to complete the transfer to the Shooter.

271.    In June or July 2020, Red Dot Arms transferred the M&P rifle to the Shooter after, upon information and belief, conducting a background check and verifying the Shooter's ID.

272.    Both the federal transaction form and the Shooter's ID should have shown that he resided in either Highland Park or Highwood, both of which prohibited the Shooter from acquiring or possessing an assault weapon like the M&P rifle.

273.    Upon information and belief, despite knowing that the Shooter resided in a municipality that prohibited the possession of assault weapons, Red Dot Arms transferred the M&P rifle to the Shooter, thereby knowingly aiding and abetting the violation of the ordinances.

274.    The Gun Store Defendants' aforementioned conduct was a direct and proximate cause of harm to Plaintiffs, by causing the Shooter to gain unlawful possession of an assault weapon, which he used to shoot and terrify Plaintiffs.

275.    As a direct and proximate result of the aforementioned conduct, Plaintiffs have sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

276.    As a direct and proximate result of the aforementioned conduct, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

277.    Accordingly, Plaintiffs are entitled to recovery against the Gun Store Defendants in an amount to be determined at trial.

WHEREFORE, Plaintiffs, AMELIA TENORIO, individually and as parent and next friend of C.M., and ANTONIO MELGAR, individually and as parent and next friend of C.M., pray for judgment against Defendants, BUDSGUNSHOP.COM, LLC and RED DOT ARMS, INC., for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

**COUNT VII**
**Negligence**
*(All Plaintiffs v. Robert Crimo Jr.)*

278.     Plaintiffs incorporate paragraphs 1 through 16 of the Introduction section, 17 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdictional section, paragraphs and 36 through 150 of the General Allegations section, as if fully set forth herein.

279.     It was well documented long before the Fourth of July shooting that the Shooter was too dangerous and unstable to have access to weapons—especially firearms.  And nobody knew that better than the Shooter's Father, Robert Crimo Jr.

280.     In April 2019, at the age of 18, the Shooter attempted suicide with a machete.

281.     Just a few months later, in September 2019, the Shooter made threats to a family member, who reported that the Shooter planned to "kill everyone."  When law enforcement came to the home, they seized 16 knives, a dagger, and a sword from the Shooter.  However, the Shooter's Father said that the weapons were his and "being kept in [the Shooter's] room for safekeeping."  Both parents denied that the Shooter had threatened anyone.

282.     Upon information and belief, the knives, dagger, and sword belonged to the Shooter, not his father.

283.     The Shooter was not charged with a crime, but a "clear and present danger report" was filed with the Illinois State Police.

284.     Upon information and belief, the Shooter's Father knew that his son had been deemed a "a clear and present danger" in September of 2019.

285.     Despite this, in December 2019, he sponsored his son's application for a FOID card, which would allow the Shooter to purchase and possess firearms.

286.     The standard form, including, upon information and belief, the form signed by the Shooter's Father, stated the following:  "I hereby give my consent for this minor applicant to possess and acquire firearms and firearm ammunition and understand I shall be liable for any damages resulting from the minor applicant's use of firearms or firearm ammunition."

287.     Without his father's sponsorship, the Shooter would not have been able to obtain a FOID card and would not have been able to purchase, at the age of 19, the Smith & Wesson M&P rifle that he used to commit the shooting.

288.     Upon information and belief, the Shooter's Father was aware of his son's hate-filled and violent rhetoric.

289.     Upon information and belief, the Shooter's Father knew that his son was unstable and wanted to kill people.

290.     Yet despite this, upon information and belief, the Shooter's Father did not contact law enforcement to warn them of the danger posed by his son.

291.      Upon information and belief, the Shooter's Father also did not take any steps to obtain a Firearms Restraining Order, or take any other action, to remove the firearms from the Shooter's possession.

292.     Even though the Shooter's Father's actions caused his son to have access to firearms, he did not take any action to mitigate the threat posed by his son.

293.     Each of these actions and omissions constitutes negligence.

294.     As a direct and proximate result of the negligence of the Shooter's Father, Plaintiffs have sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

295. As a direct and proximate result of the negligence of the Shooter's Father, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

296. Accordingly, Plaintiffs are entitled to recovery against the Shooter's Father in an amount to be determined at trial.

WHEREFORE, Plaintiffs, AMELIA TENORIO, individually and as parent and next friend of C.M., and ANTONIO MELGAR, individually and as parent and next friend of C.M., pray for judgment against Defendant, ROBERT CRIMO, JR., for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

## COUNT VIII
### Battery
### *(Amelia Tenorio, individually and as parent and next friend of C.M., and Antonio Melgar, as parent and next friend of C.M. v. Robert Crimo III)*

297. Plaintiffs Amelia Tenorio, individually and as parent and next friend of C.M., and Antonio Melgar, as parent and next friend of C.M. incorporate paragraphs 1 through 16 of the Introduction section, 17 through 31 of the Parties section, paragraphs 32 through 35 of the Jurisdictional section, paragraphs and 36 through 150 of the General Allegations section, as if fully set forth herein.

298. On July 4, 2022, with malicious intent, the Shooter fired 83 rounds into a crowd of parade-goers below him using an M&P assault rifle.

299. The Shooter killed seven people, injured dozens of others, and terrorized countless others.

300.     The foregoing conduct was deliberate and outrageous and was conducted with the intent to terrify, and to injure, maim, and kill people at the parade, including Plaintiffs, and, as such, constituted an intentional harmful or offensive contact with all Plaintiffs physically struck by projectiles and/or shrapnel.

301.     As a direct and foreseeable result of the Shooter's actions, Plaintiffs have sustained and will sustain physical pain, mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

302.     As a direct and proximate result of the Shooter's actions, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

303.     Accordingly, Plaintiffs are entitled to recovery against the Shooter in an amount to be determined at trial.

WHEREFORE, Plaintiffs, AMELIA TENORIO, individually and as parent and next friend of C.M., and ANTONIO MELGAR, as parent and next friend of C.M., pray for judgment against Defendant, ROBERT CRIMO, III, for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

**COUNT IX**
**Assault**
(*Antonio Melgar v. Robert Crimo, III*)

304.     Plaintiff, Antonio Melgar, individually, incorporates paragraphs 1 through 16 of the Introduction section, 17 through 31 of the Parties section, paragraphs 32 through 35 of the

Jurisdictional section, paragraphs and 36 through 150 of the General Allegations section, as if fully set forth herein.

305.    On July 4, 2022, with malicious intent, the Shooter fired 83 rounds into a crowd of parade-goers below him using an M&P assault rifle.

306.    The Shooter killed seven people, injured dozens of others, and terrorized countless others.

307.    The foregoing conduct was deliberate and outrageous and was conducted with the intent to terrify, and to injure, maim, and kill people at the parade, including Plaintiffs.

308.    Plaintiffs, whether struck by projectiles and/or shrapnel or not, experienced reasonable apprehension of imminent offensive contact as a direct and proximate result of the Shooter's intentional actions.

309.    As a direct and foreseeable result of the Shooter's actions, Plaintiffs have sustained and will sustain mental suffering, loss of enjoyment of life, anxiety, and severe emotional distress.

310.    As a direct and proximate result of the Shooter's actions, Plaintiffs have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

311.    Accordingly, Plaintiffs are entitled to recovery against the Shooter in an amount to be determined at trial.

WHEREFORE, Plaintiff, ANTONIO MELGAR, individually, prays for judgment against Defendant, ROBERT CRIMO, III, for an amount necessary to compensate Plaintiff for his damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

**COUNT X**
**IIED and NIED**
***(Antonio Melgar v. All Defendants)***

312.     Plaintiff, Antonio Melgar, individually, incorporate the foregoing allegations as if fully set forth herein.

313.     On July 4, 2022, with malicious intent, the Shooter fired 83 rounds into a crowd of parade-goers below him using an M&P assault rifle.

314.     As set forth in the various counts against each Defendant, the Shooter was enabled to purchase and use the M&P assault rifle through the conduct of the Smith & Wesson Defendants, the Gun Store Defendants, and Robert Crimo, Jr.

315.     Each defendants' conduct was both extreme and outrageous.

316.     Because of Antonio Melgar's proximity to the Shooter and the shooting victims, including but not limited to Plaintiffs Amelia Tenorio and C.M., Plaintiff was in a zone of physical danger.

317.     Plaintiff Antonio Melgar reasonably experienced fear for his own safety because of the Shooter's conduct.

318.     As a direct and proximate result of the Shooter's conduct, Plaintiff Antonio Melgar experienced emotional distress, as well as physical injury and illness resulting from the emotional distress, including but not limited to physical pain, mental suffering, loss of enjoyment of life, anxiety and severe emotional distress.

319.     As a direct and proximate result of the Shooter's actions, Plaintiff Antonio Melgar has incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

320.    Accordingly, the Plaintiff, Antonio Melgar, individually is entitled to recovery against the Shooter in an amount to be determined at trial.

WHEREFORE, Plaintiff, ANTONIO MELGAR, prays for judgment against Defendants, SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., BUDSGUNSHOP.COM, LLC, RED DOT ARMS, INC., ROBERT CRIMO, JR., and ROBERT CRIMO, III, for an amount necessary to compensate Plaintiff for his damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

## COUNT XI
### IIED and NIED
### (Amelia Tenorio, individually and as parent and next friend of C.M., and Antonio Melgar, as parent and next friend of C.M. v. All Defendants)

321.    Plaintiffs Amelia Tenorio, individually and as parent and next friend of C.M., and Antonio Melgar, as parent and next friend of C.M., incorporate the foregoing allegations as if fully set forth herein.

322.    On July 4, 2022, with malicious intent, the Shooter fired 83 rounds into a crowd of parade-goers below him using an M&P assault rifle.

323.    As set forth above, the Shooter was enabled to purchase and use the M&P assault rifle through the conduct of the Smith & Wesson Defendants, the Gun Store Defendants, and Robert Crimo, Jr.

324.    Each defendants' conduct was both extreme and outrageous.

325.    Plaintiffs Amelia Tenorio and C.M., as shooting victims, were directly impacted by the Shooter's conduct.

326.    Plaintiffs Amelia Tenorio and C.M. reasonably experienced fear for their own safety because of the Shooter's conduct.

327.    As a direct and proximate result of the Shooter's conduct, Plaintiffs Amelia Tenorio and C.M. experienced emotional distress, including but not limited to physical pain, mental suffering, loss of enjoyment of life, anxiety and severe emotional distress.

328.    As a direct and proximate result of the Shooter's conduct, Plaintiffs Amelia Tenorio and C.M. have incurred economic damages, including lost future income, lost earning capacity, and past and future medical expenses and related expenses.

329.    Accordingly, Plaintiffs Amelia Tenorio, individually and as parent and next friend of C.M., and Antonio Melgar, as parent and next friend of C.M. are entitled to recovery against the Shooter in an amount to be determined at trial.

WHEREFORE, Plaintiffs, AMELIA TENORIO, individually and as parent and next friend of C.M., and ANTONIO MELGAR, as parent and next friend of C.M., pray for judgment against Defendants, SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., BUDSGUNSHOP.COM, LLC, RED DOT ARMS, INC., ROBERT CRIMO, JR., and ROBERT CRIMO, III, for an amount necessary to compensate each Plaintiff for their damages, which exceed the jurisdictional minimum of the law division of the Circuit Court of the 19th Judicial Circuit, Lake County, Illinois, plus fees and costs of bringing this action and all applicable statutory interest.

**PLEASE TAKE NOTICE THAT PLAINTIFFS DEMAND A TRIAL BY JURY.**

Dated: September 28, 2022

Respectfully Submitted,

**EVERYTOWN LAW**
Alla Lefkowitz*
P.O Box # 14780
Washington D.C. 20044
(mailing address)
Phone: (202) 545-3257
alefkowitz@everytown.org

**ROMANUCCI & BLANDIN, LLC**
Antonio M. Romanucci
Gina A. DeBoni
Robert S. Baizer
David A. Neiman
Michael E. Holden
321 North Clark Street, Suite 900
Chicago, Illinois 60654
Phone: (312) 458-1000
Fax: (312) 458-1004
arommanucci@rblaw.net
gad@rblaw.net
rbaizer@rblaw.net
dneiman@rblaw.net
mholden@rblaw.net

**EVERYTOWN LAW**
Krystan Hitchcock*
Laura Keeley*
450 Lexington Ave.
P.O Box # 4184
New York, NY 10017
(mailing address)
Phone: (646) 324-8218
khitchcock@everytown.org
lkeeley@everytown.org

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
H. Christopher Boehning*
Jeffrey J. Recher*
Carly Lagrotteria*
1285 Avenue of the Americas
New York, NY 10019
(mailing address)
Phone: (212) 373-3700
cboehning@paulweiss.com
jrecher@paulweiss.com
clagrotteria@paulweiss.com

*Pro hac vice application forthcoming*

*Attorneys for Plaintiffs*

FILED
9/27/2022 11:13 PM
ERIN CARTWRIGHT WEINSTEIN
Clerk of the Circuit Court
Lake County, Illinois

IN THE CIRCUIT COURT OF THE 19ᵀᴴ JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

|  |  |
|---|---|
| AMELIA TENORIO, individually and as parent and next-friend of C.M., and ANTONIO MELGAR, individually and as parent and next friend of C.M., | |
| Plaintiffs, | No.:     22LA00000493 |
| v. | |
| SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., BUDSGUNSHOP.COM, LLC, RED DOT ARMS, INC., ROBERT CRIMO, JR., and ROBERT CRIMO, III, | |
| Defendants. | |

### AFFIDAVIT REGARDING DAMAGES SOUGHT PURSUANT TO SCR 222(B)

Pursuant to Illinois Supreme Court Rule 222(B), Michael E. Holden, being first duly sworn under oath, states that: (1) He is one of the attorneys of record for the Plaintiff in this matter; and (2) The total money damages sought in this civil action exceeds $50,000.

FURTHER AFFIANT SAYETH NOT.

Respectfully Submitted,
ROMANUCCI & BLANDIN, LLC

By: _____
Michael E. Holden
Attorney for the Plaintiff

1

**FILED**
**9/27/2022 11:13 PM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

IN THE CIRCUIT COURT OF THE 19ᵀᴴ JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

|  |  |
|---|---|
| AMELIA TENORIO, individually and as parent and next-friend of C.M., and ANTONIO MELGAR, individually and as parent and next friend of C.M., | 22LA00000493 |
| Plaintiffs, | No.: |
| v. |  |
| SMITH & WESSON BRANDS, INC., SMITH & WESSON SALES COMPANY, SMITH & WESSON, INC., BUDSGUNSHOP.COM, LLC, RED DOT ARMS, INC., ROBERT CRIMO, JR., and ROBERT CRIMO, III, |  |
| Defendants. |  |

**JURY DEMAND**

The undersigned demands a jury trial.

Dated: September 28, 2022

Respectfully Submitted,

**EVERYTOWN LAW**
Alla Lefkowitz*
P.O Box # 14780
Washington D.C. 20044
(mailing address)
Phone: (202) 545-3257
alefkowitz@everytown.org

**ROMANUCCI & BLANDIN, LLC**
Antonio M. Romanucci
Gina A. DeBoni
Robert S. Baizer
David A. Neiman
Michael E. Holden
321 North Clark Street, Suite 900
Chicago, Illinois 60654
Phone: (312) 458-1000
Fax: (312) 458-1004
arommanucci@rblaw.net
gad@rblaw.net
rbaizer@rblaw.net
dneiman@rblaw.net
mholden@rblaw.net

1